IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN PROFESSIONAL AGENCY, INC.<br>95 Broadway<br>Amityville, New York 11701<br><br>     Plaintiff<br><br>v.<br><br>NASW ASSURANCE SERVICES, INC.<br>50 Citizens Way, Suite 304<br>Frederick, Maryland 21701<br><br>and<br><br>NATIONAL ASSOCIATION OF<br>SOCIAL WORKERS, INC.<br>750 First Street, N.E., Suite 700<br>Washington, DC 20002<br><br>    Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. _____<br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF

Plaintiff AMERICAN PROFESSIONAL AGENCY, INC. ("APA"), by undersigned

counsel, as and for its Complaint against Defendants NASW ASSURANCE SERVICES, INC.

("ASI") and NATIONAL ASSOCIATION OF SOCIAL WORKERS, INC. ("NASW"),

respectfully states as follows:

### NATURE OF THE SUIT

1. APA is an established insurance producer (sometimes referred to in the industry

and herein as an "insurance agent"), with a focus on insurance products purchased by mental

health professionals. APA's primary focus involves placements of professional liability

insurance for persons engaged in providing services in the field of mental health. APA and its

5598189.1

individual producers are appropriately licensed in various jurisdictions to sell, solicit, and negotiate this line of insurance and others.

2.      Since 1969, APA has placed members of the NASW with professional liability insurance policies issued by insurance underwriters.   APA prompted the creation and development of an NASW endorsed program to offer the NASW members professional liability through APA by means of APA's relationship with certain insurance underwriters willing to write the coverage.   While the NASW members could purchase professional liability insurance outside the program, APA acted as the exclusive insurance agent with regard to member purchases from the insurance underwriters that APA arranged to issue professional liability policies.

3.  In 1988, APA and the National Association of Social Workers Insurance Trust (the "Trust"), a wholly owned or controlled affiliate of the NASW, entered into a written agreement concerning their respective rights and obligations relating to this program (the "1988 Agreement").   On information and belief, the Trust is out of existence.   ASI, a wholly owned affiliate of the NASW, contends that the Trust assigned the 1988 Agreement to ASI by means of 1997 assignments involving the NASW, the Trust, and ASI.

4.   Under the 1988 Agreement, the Trust, and then ASI, was responsible for the promotion and marketing of the program.   In exchange for the NASW affiliate's promotion and marketing services, APA paid the NASW affiliate an annual fee. The NASW and its affiliates were not licensed as, and did not serve as, insurance agents for purposes of placing the NASW members in professional liability insurance policies.   The NASW and its affiliates did not maintain relationships with insurance underwriters issuing professional liability insurance policies to NASW members through such a program.

5.    After 43 years of the program and 24 years after execution of the 1988 Agreement, the two sides parted ways effective as of September 10, 2012, each giving the other notice of termination of the 1988 Agreement.

6.    Through its placement of professional liability policies for the NASW members over more than four decades, APA developed and retained information about the insureds ("Insurance Information") as is customary in the insurance industry.  The Insurance Information is not in the possession of ASI or the NASW unless APA furnishes it.  APA is required to use the Insurance Information as a licensed insurance agent for its purposes in servicing existing policies and placing renewal policies for the insureds and for APA's continuing business of offering professional liability policies to those in the mental health profession.

7.    The NASW parties, on the other hand, maintain that APA is not entitled to retain and is not entitled to make any use of APA's own data and the Insurance Information that APA developed, notwithstanding any interest of the insureds or APA in APA's continued use of its Insurance Information.  The NASW parties demanded that APA turn over to ASI and make no use of APA's own Insurance Information.  The NASW parties have also asserted that it is their position that APA cannot obtain and use information regarding policyholders from third parties such as the Chartis underwriters that issued policies to NASW members.

8.    APA is willing to turn over and share, and is preparing to turn over and share, certain information as the 1988 Agreement requires.  But APA does not accede to the demand of the NASW parties that APA cease all use of the Insurance Information that APA developed, which is customarily the property of an insurance agent and not treated otherwise in the 1988 Agreement, or that APA refrain from obtaining and using information regarding policyholders from third-party sources in the future, such as the Chartis underwriter.

9.    Both APA and the NASW parties rely on the 1988 Agreement for their positions.

10.    Accordingly, there is an actual controversy within the jurisdiction of this court, and APA seeks a declaratory judgment with respect to that actual controversy pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, as well as ancillary relief.

## THE PARTIES

11.    Plaintiff APA is a body corporate created and existing under and by virtue of the laws of the State of New York. APA has its principal place of business in the State of New York.

12.    Defendant the NASW is a body corporate created and existing under and by virtue of the laws of the State of Delaware. The NASW has its principal place of business in the District of Columbia.

13.    Defendant ASI is a body corporate created and existing under and by virtue of the laws of the State of Delaware. ASI has its principal place of business in the State of Maryland. NASW and ASI claim that ASI is bound by and possesses all rights and remedies previously available to the Trust under the 1988 Agreement by way of 1997 assignments involving the Trust, NASW, and ASI.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332. The matter in controversy exceeds the value of $75,000, exclusive of interests and costs, and is between citizens of different states.

15.    This Court has personal jurisdiction over Defendants pursuant to the 1988 Agreement, which provides as follows: "This agreement shall be governed by the laws of the District of Columbia, and any action involving a dispute over the provisions of this agreement or

for redress shall first be brought in the courts of that jurisdiction." This Court has personal jurisdiction over Defendants also under D.C. Code § 13-421, *et seq*. Defendants subjected themselves to this Court's personal jurisdiction by (i) domiciling in, organizing under the laws of, or maintaining a principal place of business in the District of Columbia; (ii) transacting business in the District of Columbia; and (iii) contracting to supply services in the District of Columbia.

## FACTS

16.    In 1988, APA and the Trust executed the 1988 Agreement, a true and correct copy of which accompanies this Complaint as Exhibit 1 and is incorporated herein by reference. Among other terms, the 1988 Agreement provides that APA shall act as managing general agent and agent of record for the professional liability insurance program of the Trust. The 1988 Agreement, ¶1. The insurance program shall be offered to NASW members throughout the United States that meet established underwriting criteria. *Id.*, ¶¶2, 5. In addition, APA has the right and ability to secure and service the underwriting insurer for purposes of the program, but the Trust has the right to disapprove of the selection. *Id.*, ¶6.

17.    The 1988 Agreement grants APA the exclusive right as "managing general agent" to place professional liability coverage for the NASW members during pendency of the Agreement, with entitlement to commission from the underwriter. *Id.*, ¶¶19, 20. On information and belief, NASW's membership exceeds 145,000 persons.

18.    In the District of Columbia, as in many jurisdictions, a managing general agent or general agent in the placement of insurance refers to persons or entities performing functions for insurers and/or insureds in the procurement and placement of insurance. The District of Columbia Code defines "Managing General Agent" as a person, firm, association, or corporation that performs certain functions on behalf of an "Insurer." D.C. Code §31-1501(4). An "Insurer"

is then defined as a person, firm, association, or corporation duly licensed as an insurance company pursuant to the Code. D.C. Code § 31-1501.

19.    APA had only contractual obligations to the Trust. In placing insurance for the insureds through the program, APA was not the agent of the Trust and did not owe any agency duties to the Trust. APA did not contract with, and was not the agent of, NASW or ASI, and APA did not owe agency duties to NASW or ASI. To the extent of effective assignment of the 1988 Agreement between the Trust and ASI, APA's duties to ASI would be no greater than its duties to the Trust, which were limited to those set forth in the 1988 Agreement.

20.    The 1988 Agreement obligates the Trust to cooperate with and assist APA in presenting the program to NASW members. The Trust's cooperation specifically includes facilitating contact, providing up-to-date contact lists of NASW members, and providing information on NASW members' insurance needs. *Id.*, ¶14.

21.    The 1988 Agreement also obligates the Trust to promote and market the program. In exchange for endorsing the program and providing APA with promotional and marketing services, the Trust receives a fee from APA. *Id.*, ¶17.

22.    The 1988 Agreement does not grant to NASW, the Trust or ASI, and does not reserve for NASW, the Trust or ASI, the right or the prerogative to offer or to sell professional liability insurance or to compete in any fashion with APA in the placement of professional liability insurance for NASW members.

23.    The 1988 Agreement requires APA to furnish the Trust annual management reports containing data about the number of insureds, number of new insureds, number of applicants, rejection ratios, collected premiums, and claims information, and a list of all current policyholders with identifying information. *Id.*, ¶7. APA has met that requirement faithfully.

24.    In addition, the 1988 Agreement contains the following three paragraphs that relate to possession and control of information:

> 8.    All information and all documents, membership lists, books and records, including the information contained therein, furnished by the Trust to [APA] shall remain the property of the Trust and may only be used by [APA] to perform its obligations under this agreement.    Such information shall be treated as confidential by [APA] who shall not disclose it to third parties except for the use of the underwriting insurer when necessary.

> 9.    All documents and membership lists of [APA] pertaining to any insurance, individual insurance policies, membership development, or services, provided under the Program whether original records of [APA] or furnished by the Trust, shall be open for inspection at [APA's] principal place of business, during business hours.  This paragraph shall not apply to the financial records of [APA].

> 10.    Upon the effective date of the termination of this agreement, or at the option of the Trust anytime within ninety (90) days prior to the effective date of termination, the [APA] shall turn over to the underwriting insurance company or any other party designed by the Trust a list of all participants including all individuals, agencies, schools, and others under the Program along with a record layout, field definition, last date of premium update, cutoff date of the listing, last policy number used, the expiration date of coverage under the insurance program for each insured participant, and a current record of premiums paid by each such insured participant.

25.    APA made arrangements with AIG, now Chartis, and more specifically certain of its operating insurance underwriters, for purposes of the insurance offered through the program. Chartis insurers have long issued the coverage that APA placed for insureds in the program.

26.    Over time, the program flourished, proving very popular for NASW's members. On information and belief, many, likely a majority, of NASW members joined NASW just to obtain the insurance that APA offered through the program.

27.    Notwithstanding their obligation to do so, ASI and NASW did not provide APA with up-to-date member lists of NASW or with information on members' insurance needs. Notwithstanding their obligation to do so, ASI and NASW did not provide APA with specific

information about NASW members that would permit APA to contact all NASW members regarding professional liability insurance.

28.   As a result of NASW's, the Trust's, and ASI's failure to furnish the information that the 1988 Agreement required them to furnish, APA does not have "information and … documents, membership lists, books and records, including the information contained therein, furnished by the Trust" that would be the property of the Trust, or that is confidential, under paragraph 8 of the 1988 Agreement.

29.   On information and belief, ASI is without knowledge of the proclivities of NASW members in purchasing professional liability insurance. As NASW members are not required to purchase professional liability insurance through the program, and as ASI simply provides direction for interested members to contact APA, on information and belief, ASI has not developed or otherwise compiled, and lacks knowledge of, (i) the number of NASW members that are insureds in the program, (ii) the premiums that the insureds paid and pay, (iii) the limits and other terms of the policies that the insureds purchased, and (iv) the expiration dates of the policies.

30.   Only APA and Chartis are privy to this information, unless and until APA shares such information with ASI.

31.   ASI has sought to generate more income for itself from the program. Specifically, ASI sought increased payments from APA and/or Chartis. APA and Chartis refused.

32.   ASI also sought to have Chartis replace APA. Chartis again refused.

33.   On information and belief, ASI explored retaining a replacement underwriter in an effort to transfer the program in a manner that would result in the exclusion of APA.

5598189.1                                          - 8 -

34.    On information and belief, ASI also is in process of creating a self-insured Risk Retention Group that would provide NASW's members with professional liability coverage without the need for, and excluding, APA and Chartis.  On information and belief, ASI intends to fund the Risk Retention Group and/or related reinsurance with premiums derived from the sale of life insurance premiums and other products.

35.    ASI's actions and contemplated actions as set forth in paragraphs 31-34 above are material breaches of the 1988 Agreement that are intended to harm, have harmed and/or will harm APA.

36.    In addition to the foregoing actions, NASW and ASI are insisting that all Insurance Information that APA developed and maintained belongs exclusively to ASI.

37.    APA has no information that the Trust, NASW or ASI furnished pursuant to paragraph 8 of the 1988 Agreement.

38.    Under paragraph 9 of the Agreement, the Trust has only the right to inspect APA's documents relating to membership lists, insurance policies, membership development and services that APA provided to insureds under the program.  Paragraph 9 does not grant the Trust, NASW or ASI any property right in APA's information, any right to limit or preclude APA's retention and use of APA's information or any right of confidentiality or exclusivity with respect to APA's information.

39.    Paragraph 10 requires only that APA prepare and furnish the Trust a list of discrete, enumerated items.  APA informed ASI that APA intends to prepare and furnish the list that paragraph 10 requires, and APA will prepare and furnish that list shortly.

40.    APA has the right to retain and use the Insurance Information for legitimate business purposes. The 1988 Agreement does not limit or restrict APA's retention or use of the

Insurance Information that APA created, developed, and acquired after termination of the 1988 Agreement, and it does not require APA to provide the Trust, NASW, or ASI with APA's Insurance Information, but rather identifies in its paragraph 10 the list of discrete, enumerated items that APA is to provide the underwriter or other Trust designee upon termination.

41.    Professional liability policies that APA placed for the NASW members are written on a claims-made basis with many differing expiration dates.  Among other reasons, APA requires the use of its Insurance Information to service existing policies.  The insureds have an interest in achieving a continuity of their coverages through renewal of existing policies. Statutes and regulations applicable to insurance policies sold in various jurisdictions restrict cancellation or non-renewal of existing policies by limiting the grounds for cancellation or non-renewal and imposing strict notification requirements in the event of cancellation or non-renewal.  APA requires the use of Insurance Information to ensure that insured policyholders are able to achieve a continuity of coverage for their claims-made policies through the renewal process and to maintain compliance with such statutes and regulations.  APA also requires the use of its Insurance Information to continue its business as an insurance agent placing policies for mental health professionals.

42.    While none of NASW, ASI, or the Trust was in the business of placing professional liability insurance policies or issuing professional liability policies during the APA's creation, development, and acquisition of the Insurance Information, on information and belief, NASW, ASI, or other affiliated entities seek to enter such business pursuits in the future and utilize Insurance Information to their financial benefit in such pursuits.  The Insurance Information that is in controversy is highly valuable to both sides and can be used, as it has been used, to generate millions of dollars of insurance premiums.

43. Accordingly, there is an actual controversy that warrants review and judgment under the 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.

44. It is not just the interest of the parties to this litigation that are at stake. The insureds have interests in renewing and retaining their professional liability insurance and in the servicing of existing policies. Also, potential insureds have interests in obtaining professional liability insurance.

45. Because of the interests of the insureds and potential insureds, and because of the nature of the insurance placement and renewal business, it is imperative that there be a resolution of the controversy as promptly as possible.

## COUNT ONE
### Breach of Contract - Declaratory Judgment

46. APA incorporates herein by reference and realleges paragraphs 1-45 above.

47. APA is entitled to a declaratory judgment that:

A. APA has the contractual and customary rights to retain and to use the defined Insurance Information for legitimate business purposes, free and clear of any claim of right, limitation or other interest by NASW, ASI or any person or party affiliated with or claiming through NASW or ASI.

B. APA has the rights to seek from others, including insurers and underwriters, information similar to the defined Insurance Information and other information relating to insureds or potential insureds for legitimate business purposes, free and clear of any claim of right, limitation or other interest by NASW, ASI or any person or party affiliated with or claiming through NASW or ASI.

C.      APA has no obligation to provide NASW or ASI the Insurance Information that APA created, developed, or acquired other than the list of specific, enumerated items contained in paragraph 10 of the 1988 Agreement.

## COUNT TWO
### Breach of Contract - Damages

48.      APA incorporates herein by reference and realleges paragraphs 1-45 above.

49.      By failing and refusing to furnish APA with information that the 1988 Agreement required the Trust, NASW and ASI to furnish and by forming a risk retention group and taking other actions to replace or diminish APA's role as the exclusive insurance agent for purposes of placing professional liability insurance through traditional insurance arranged by APA, Defendants materially breached the letter and spirt of the 1988 Agreement and caused APA to suffer harm.

WHEREFORE, APA respectfully prays for judgment against Defendants jointly and severally as follows:

1.      On Count One, for a declaratory judgment that:

A.      APA has the rights to retain and to use the defined Insurance Information for legitimate business purposes, free and clear of any claim of right, limitation or other interest by NASW, ASI or any person or party affiliated with or claiming through NASW or ASI.

B.      APA has the rights to seek from others, including insurers and underwriters, information similar to the defined Information and other information relating to insureds or potential insureds for legitimate business purposes, free and clear of any claim of right, limitation or other interest by NASW, ASI or any person or party affiliated with or claiming through NASW or ASI.

C.    APA has no obligation to provide NASW or ASI the Insurance Information that APA created, developed, or acquired other than the list of specific, enumerated items contained in paragraph 10 of the 1988 Agreement.

2.    On Count Two, for compensatory damages in such amount as APA may prove at trial.

3.    For pre-judgment and post-judgment interest, costs and expenses, including attorneys' fees; and

4.    For such other and further relief as may be warranted.

Dated this 7th day of September 2012.

Respectfully submitted,

Harvey A. Levin (D.C. Bar No. 203869)
THOMPSON COBURN LLP
1909 K Street, N.W. Suite 600
Washington, D.C. 20006-1167
T: (202) 585-6942 (direct)
F: (202) 508-1013 (direct)
email: hlevin@thompsoncoburn.com

Counsel for American Professional Agency, Inc.

Of Counsel:
Matthew S. Darrough (not admitted in D.C.)
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, MO 63101
T: (314) 552-6552 (direct)
F: (314) 552-7552 (direct)
email: mdarrough@thompsoncoburn.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN PROFESSIONAL AGENCY, INC.<br>95 Broadway<br>Amityville, New York 11701<br><br>Plaintiff<br><br>v.<br><br>NASW ASSURANCE SERVICES, INC.<br>50 Citizens Way, Suite 304<br>Frederick, Maryland  21701<br><br>and<br><br>NATIONAL ASSOCIATION OF<br>SOCIAL WORKERS, INC.<br>750 First Street, N.E., Suite 700<br>Washington, DC 20002<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**EXHIBIT 1**

**TO**

**COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF**

08/07/2012  14:43    6318458779              ROBERT L FOLKS                    PAGE  04/19
05-15-12;11:17AM;

## AGREEMENT

This agreement is entered into between the National Association of Social Workers Insurance Trust (hereinafter "Trust") and the American Professional Agency, Inc. (hereinafter "MGA") on this _8'th_ day of _November_, 1988. This agreement supersedes all prior agreements entered into between the parties.

In consideration of the mutual promises contained herein and other good and valuable consideration, the parties hereto agree as follows:

1. The MGA shall act as managing general agent and agent of record for the professional liability insurance program of the Trust (hereinafter "Program").

2. The program shall be a program of professional liability insurance offered to members of the National Association of Social Workers (hereinafter "NASW") and social service agencies in all jurisdictions of the United States in which permitted by law.

3. In the event that the Program should not be offered or should be cancelled in any jurisdiction, notice must be given to the Trust by the MGA not less than thirty (30) days from the date the MGA receives such notice.

4. The policy and application (including the premium structure for the program) attached to this agreement shall constitute the terms of the Trust program offered. Changes in the policy or application or premiums charged must be provided in writing to the Trust no later than seven (7) days from the date

received by the MGA from the insurer.  Notice of any changes in coverage or premiums shall be provided to the insured members no later than sixty (60) days prior to the renewal date of the insured's policy.

5.   The program shall be offered to all NASW members which meet established underwriting criteria.  The MGA may, upon prior consultation with the Trust, change the insurance application or apply additional criteria based upon professional ethics and standards of practice.

6.   The Trust shall have the right to approve or disapprove any insurer which the MGA chooses to underwrite the program.  The agreement between the MGA and the insurer will provide that if the program is terminated or if this agreement is terminated, the insurer will be responsible for all claims adjustment and other run-off activities.

7.   The MGA shall furnish to the Trust, on no less than an annual basis, management reports describing the program operating results.  The management report shall contain, at a minimum, but not be limited to, data, in aggregate and by state, concerning the number of insureds, number of new insureds, number of applications issued for the program with acceptance/rejection ratios, categories of reasons for rejection, lapse ratios, amount in dollars of premium collected, number and amount in dollars of claims, a list of actual individual policyholders' claims paid by name, description, and amount, the combined loss ratio for the risks insured under the program, a list of all current policyholders including individual certificate holders under a

-  2  -

policy with identifying information, and any other information requested from time to time by the Trust or which the MGA believes is relevant or of interest.

8.  All information and all documents, membership lists, books and records, including the information contained therein, furnished by the Trust to the MGA shall remain the property of the Trust and may only be used by the MGA to perform its obligations under this agreement.  Such information shall be treated as confidential by the MGA who shall not disclose it to third parties except for the use of the underwriting insurer when necessary.

9.  All documents and membership lists of the MGA pertaining to any insurance, individual insurance policies, membership development, or services, provided under the Program whether original records of the MGA or furnished by the Trust, shall be open for inspection at the Agent's principal place of business, during business hours.  This paragraph shall not apply to the financial records of the MGA.  The MGA may store any or all such documents in microfilm or other similar medium.

10.  Upon the effective date of the termination of this agreement, or at the option of the Trust anytime within ninety (90) days prior to the effective date of termination, the MGA shall turn over to the underwriting insurance company or any other party designated by the Trust a list of all participants including all individuals, agencies, schools, and others under the Program along with a record layout, field definition, last date of premium update, cutoff date of the listing, last

- 3 -

08/07/2012  14:43    6318458779          ROBERT L FOLKS                    PAGE  07/19

#  8/ 22

policy number used, the expiration date of coverage under the insurance program for each insured participant, and a current record of premiums paid by each such insured participant. All such records shall be handed over in an orderly condition.

11.   In the event that either party elects to terminate this agreement, termination may be without cause and notice shall be given in writing by certified United States mail return receipt requested or personal service at least nine (9) months prior to the effective date of such termination. The Trust, as agent for NASW, agrees to give the MGA not less than nine (9) months' notice prior to the termination of the Trust.

12.   The MGA agrees to indemnify and hold harmless the Trust from and against any and all claims, damages, losses and liabilities, including reasonable attorneys' fees and costs, arising out of any action taken by the MGA under the terms of this agreement to the extent that the MGA is found to have been negligent.

13.   The Trust agrees to indemnify and hold harmless the MGA from and against any and all claims, damages, losses and liabilities, including reasonable attorneys' fees and costs, arising out of any action taken under the terms of this agreement by the Trust, or any insurance entity it owns in whole or in part or operates, and from any actions taken in opposition to the advice of the MGA, to the extent that the Trust or NASW is found negligent.

- 4 -

14. The Trust shall cooperate with and assist the MGA in the presentation of the Program to members of the NASW. The Trust shall have responsibility for presentation of the Program to members of the NASW. The Trust's assistance shall include facilitating contact with and solicitation of NASW members and providing up-to-date membership lists of NASW, information on members' insurance needs, input on application contents and coverage features including policy design to meet those needs of the insureds, and input on the language and contents of promotional literature.

15. So long as this agreement is in effect, the MGA shall cooperate with the Trust in the promotion, marketing and administration of the Program and shall not take any action which adversely affects the ability of the Program to operate and to maintain liability coverage for participants in the Program. In this regard, the MGA shall periodically consult with the Trust on the operation of the Program as well as any problems of which the MGA may become aware.

16. No promotional literature (including brochures, pamphlets, letters, mailings) referring to the Program shall be distributed without the prior approval of the Trust and the MGA. The MGA shall be responsible for reviewing all such promotional literature for compliance with the then existing insurance laws including published advertising regulations.

17. The Trust shall be entitled to an administrative and promotion fee for the endorsement of the Program by the Trust and by NASW and for services rendered to the MGA in the

- 5 -

promotion, marketing and administration of the Program. This fee shall be measured by the annual premium volume in order to reflect the level of support which the Trust provides. The fee shall be equal to 2.5% of gross premiums written plus $90,000 annually. Payment will be accomplished by having the MGA pay to the Trust an amount equal to its prior year's fee (including $90,000), and payment shall be made in advance on July 1 of each year and shall be subject to adjustment at the end of the same calendar year to equal the above percentage plus $90,000.

18. Any broker or producer that the Trust of NASW shall designate under paragraph (19) following, shall first be approved by the MGA. Such broker and or individual shall comply with all required insurance regulations and licensing requirements within such states and districts that require compliance based on its determination of doing business in such state or district. Such broker or producer shall have no authority from any party to this agreement to solicit, advise, represent, market or in any way administer or manage this program.

19. All coverage provided under the policy shall be placed through the MGA. The Trust shall have the right, subject to paragraph 18 above, to designate a broker and/or individual producer, and that person shall have a sub-producer's agreement with the MGA.

20. It is recognized that in return for providing services as a managing general agent for the Program, as well as the services specifically enumerated herein, the MGA shall receive a commission from the underwriting insurer.

- 6 -

21.   The MGA shall actively assist the Trust in establishing, implementing, and operating on an ongoing basis a risk management program.   The risk management program shall have as its purpose the education of insured members of the NASW on ways of reducing exposure to professional liability in their practice.   This shall not require the MGA to expend any monies in connection with such program.

22.   The MGA shall at all times while this agreement is in effect comply with the insurance laws of the District of Columbia, including maintaining a valid insurance license and all qualifications required by law.

23.   This agreement shall be governed by the laws of the District of Columbia, and any action involving a dispute over the provisions of this agreement or for redress shall first be brought in the courts of that jurisdiction.

IN WITNESS WHEREOF, the parties hereto have entered into this agreement this ___8th___ day of _November_, 1988.

National Association of Social
Workers Insurance Trust

By: _Dolores S. Delahanty_
    Dolores Delahanty
    Chairperson

American Professional Agency, Inc.

By: _Richard C. Imbert_
    Richard C. Imbert
    President

(B008.D)

- 7 -